IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| JACQUELINE PRYMER, | ) | Case No. 10 C 50311 |
| | ) | |
| Plaintiff, | ) | |
| | ) | Hon. P. Michael Mahoney |
| v. | ) | U.S. Magistrate Judge |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

**I.    Introduction**

Jacqueline Prymer ("Claimant") seeks judicial review of the Social Security

Administration Commissioner's decision to deny her claim for Supplemental Security Income

("SSI") benefits and Disability Insurance Benefits ("DIB"), under Title XVI of the Social

Security Act. *See* 42 U.S.C. § 405(g). This matter is before the Magistrate Judge pursuant to the

consent of both parties, filed on December 22, 2010. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

**II.    Administrative Proceedings**

On September 24, 2008, Claimant applied for SSI and DIB, alleging that she was

disabled as of December 31, 2007. (Tr. 63, 149, 152.) This application was denied initially on

May 20, 2009 and upon reconsideration on October 7, 2009. (Tr. 98, 105, 107.) When

Claimant's request for review was denied a second time, Claimant then filed a timely request for

a hearing before an Administrative Law Judge ("ALJ") on October 27, 2009. (Tr. 113.) The

hearing took place before ALJ Lovert F. Bassett, via video teleconference between Evanston,

Illinois and Rockford, Illinois, on April 28, 2010. (Tr. 61-93.) Claimant appeared and testified in

1

Rockford with his attorney present. Vocational expert ("VE"), Richard T. Fisher, testified before the ALJ. (Tr. 144-145.) Medical expert ("ME"), Dr. Julian Freeman, also testified before the ALJ. (Tr. 146-147.)

On April 30, 2010, the ALJ found that Claimant was not disabled, and therefore, denied her claim for SSI and DIB. (Tr.40-55.) Claimant filed a Request for Review with the Social Security Administration's Office of Hearing and Appeals which was denied. (Tr. 1-3.) As a result of this denial, the ALJ's decision is considered the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 404.981, 416.1455, 416.1481. Claimant now files a complaint in this Federal District Court, seeking judicial review under 42 U.S.C. §§ 405(g), 1383(c)(3).

### III.   <u>Background</u>

Claimant was born on March 16, 1963, and was forty-seven years old when she appeared at the ALJ hearing. (Tr. 53.) Claimant was approximately five feet six inches and weighed approximately 240 pounds. (Tr. 77.) As of the hearing, Claimant lived with her daughter (born 5/29/1992) in an apartment in Rockford, Illinois. (Tr. 74, 82.) Claimant has completed high school and cosmetology school. (Tr. 53, 65.) At the hearing, she claims she no longer drives due to pain in her right foot, though a function report suggests that she was driving as late as March 16, 2009. (Tr. 81, 199.)

During the ALJ hearing, Claimant maintained that she was rear-ended in an automobile accident which has caused memory loss and cerebral spinal fluid to leak from her nose. (Tr. 76-77.) In addition, Claimant avers that since the accident she cannot stand for long periods of time and her leg "goes out" on her due to a degenerative disk in her back. (Tr. 77.) Claimant asserts that she can only walk about a half block and that if she walks more than a half block she will be laid up in bed for three or four days. (Tr. 79.) Claimant also alleges that she has a walking

problem due to a broken right foot that was not set in place. (Tr. 80.) When asked whether she has the mental capacity to manage her finances, she maintains that she is able to manage her own financial transactions and decisions. (Tr. 82.)

The ME also asked Claimant a series of questions. The ME asked whether the fluid leak has stopped to which she answered that the leak had in fact stopped. (Tr. 84.) The ME further inquired into Claimant's ability to manage her own financial affairs. Claimant stated that she was able to make financial decisions regarding her affairs. (Tr. 84.) The ME then inquired into Claimant's hygiene and social interactions. Claimant testified that she bathed daily and that she talked with people over the phone and generally did not have problems dealing with people. (Tr. 85.) To the ME question whether Claimant got lost, she responded that getting lost has not been a problem. (Tr. 86.) After the ME's questioning of Claimant, the ME opined that the record indicated a

> fairly significant head injury, enough to cause a cerebral spinal fluid leak which could imply that there was significant concussive brain damage taken place along with that. The function is not crystal clear from the record. Her testimony indicates a significant level of organic dementia being present in terms of persistence in assembling thoughts.

(Tr. 87.) He further asserts that her mental functioning would limit her to one or two-step tasks but that she did not meet or equal a 12.02 listing since her social interactions and daily activities are not at marked levels of impairment. (Tr. 87-88.) The ME also noted hypertension which he claimed was enough to limit her to a sedentary level of functioning. (Tr. 87.)

A VE also testified at the hearing to characterize the jobs that Claimant previously performed. The VE characterized Claimant's previous work as a child monitor as semiskilled, SVP 3, medium work and characterized her work as a teacher's aide as

semiskilled, SVP 3, light work. (Tr. 89.) Taking the VE's characterizations in account, the ALJ asserted that Claimant could no longer be employed in those positions. (Tr. 89-90.) The ALJ then remarked that the "key" question is whether she is able to stay on task in a competitive work environment. (Tr. 90.) The ALJ offered Claimant the opportunity to address the question of non-exertional limitations, and Claimant's attorney was allowed to submit additional evidence to the ALJ during the hearing. (Tr. 91-92.)

## IV.    **Medical History**

While this court acknowledges Claimant's extensive medical record, the parties are only contesting the medical record as it pertains to Claimant's head injury and resulting mental impairments. Therefore, this court will forgo the usual summation of the whole medical record and instead only review the record as it relates to her head injury and resulting mental impairments.

Claimant's head injury and mental issues allegedly stem from a January 26, 2001 motor vehicle accident where she was rear-ended. (Tr. 309.) On February 8, 2001, Dr. T.K. Nigam, M.D., an orthopedic surgeon, diagnosed a severe sprain to the neck and lower back. (Tr. 310.) At the time of diagnosis, she was advised to take pain medications and begin physical therapy (Tr. 310.) At a February 13, 2001 examination at Orthopedic, Sports, and Rehabilitation Clinic of Rockford, Dr. Kumud Nigam, M.D., found Claimant to be cognitively intact. (Tr. 311.) On March 29, 2001, she was brought to St. Anthony Medical Center on an emergency basis to place an external lumbar drain for the diversion of cerebral spinal fluid ("CSF"). (Tr. 322.) The CSF was leaking from her nose. (Tr. 325.) Dr. Morris Mark Soriano, M.D., diagnosed a fractured skull and ordered Claimant to have "three days of drainage via an external lumbar drain." (Tr. 331.) Dr. Soriano opined that if the leak did not seal, a craniotomy would be required to fix the

leak. (Tr. 331.) Subsequently, the leak did seal and she reported no further problems relating to the leak. (Tr. 333.)

On March 12, 2001, Claimant saw Dr. Terry Roth, M.D., P.D., who examined her with regard to her memory loss stemming from the car crash. Claimant stated that "she could not remember children's names that were well known to her." (Tr. 333.) She also reported forgetting numbers and scores (Tr. 333.) Upon examination by Dr. Roth, Claimant was alert and oriented. She could spell "telephone" forward but made a few mistakes spelling it backwards. She could recall one of three objects in five minutes and name the president. (Tr. 333.) Claimant's cranial nerves were intact and her motor function was grossly intact and symmetric in all extremities. (Tr. 333.) Dr. Roth's impression was that her memory deficits "could, conceivably, be related to a post[-]concussion syndrome and they still could improve over time." (Tr. 334.)

On December 4, 2001 and December 11, 2001, Claimant was evaluated by Licensed Clinical Psychologist Dr. Megan A. Smick. Dr. Smick found Claimant's intellectual functioning to be severely impaired, both visually and verbally. In addition, Claimant's spelling was at a 1st grade level, arithmetic at a 6th grade level, reading recognition at a grade equivalent level of 1.2, and reading comprehension at a grade equivalent level of 1.3. (Tr. 336.) Dr. Smick concluded that Claimant's speech was fluent but that her verbal lexicon and confrontation naming are severely impaired. (Tr. 336.) In addition, Claimant's verbal memory was moderately impaired and mildly impaired after a delay. Claimant's visual memory was within the average range immediately and the low average after a delay. Claimant's visual learning was significantly impaired and she was only able to learn a limited amount of information over five trials. (Tr. 336.) Dr. Smick found that Claimant's attention to visual detail and visual abstract reasoning to be severely impaired. Also, Claimant's "verbal judgment, problem solving, and abstract

reasoning were severely impaired." (Tr. 337.) On the Wisconsin Card Sorting Test, Claimant fell

within the low average range. (Tr. 337.) Behaviorally, Claimant

> showed extremely long pauses before answering even the simplest questions
> during the interview. She was also very vague in her responses, and needed many
> cues and questions in order to elicit specific information. She struggled to present
> even the simplest information about herself, including her marital status. She
> could not give a clear accounting of her daily activities. She refused to answer a
> question regarding suicidal thoughts.

(Tr. 337.) When analyzing the findings, Dr. Smick states that Claimant "shows a very unusual

pattern of neuropsychological functioning" (Tr. 337.) Dr. Smick points out that Claimant's

severe deficits in intellectual functioning are not consistent with a mild brain injury. An unusual

aspect is that "while she does show some memory impairment, this is not the severe impairment

shown in her intellectual functioning." (Tr. 337.) Another unusual aspect is "her presentation at

[the] interview with extremely long pauses as she processed even simple questions, and her

difficulty giving even basic information about herself is highly unusual, and not typical of a brain

injury." (Tr. 337.) In summary, Dr. Smick asserts that Claimant's neuropsychological profile

cannot be correlated with her brain injury. (Tr. 337.) Dr. Smick's notes suggest that the profile

could be evidence of psychiatric issues but that it is impossible to give an accurate assessment

based on the profile. (Tr. 337.)

After a seven year gap in mental treatment with regard to her mental impairment,

Claimant saw Dr. Gerald K. Hoffman, M.D., F.A.P.A., on March 17, 2009. Dr. Hoffman

reported that Claimant was well oriented as to time, place, and person. (Tr. 348.) Dr. Hoffman

opined that Claimant concentrates easily, as shown by her ability to spell her name backwards.

Dr. Hoffman observes that both her remote and recent memory is intact. Dr. Hoffman concludes

that Claimant's memory is intact and demonstrates cognitive ability. (Tr. 348.)

Upon a review ordered by the Bureau of Disability Determination Services on April 4, 2009, Psychiatrist Dr. Ellen Rozenfeld concluded that Claimant was suffering from somatoform disorders. (Tr. 349.) In terms of Claimant's functional limitations, Dr. Rozenfeld found that Claimant had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. (Tr. 359.) Dr. Rozenfeld did not diagnose Claimant with organic mental disorders. (Tr. 349.)

## V. **Standard of Review**

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing, or order a hearing of additional evidence. 42 U.S.C. § 405(g). The ALJ's legal conclusions are reviewed *de novo*. *Binion v. Charter*, 108 F.3d 780, 782 (7th Cir. 1997). However, this court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the [ALJ]." *Id.* The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case are entrusted to the Commissioner. *Schoenfeld v. Apfel,* 237 F.3d 788, 793 (7th Cir. 2001) ("Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the Commissioner.")

If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C § 405(g); *see also Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002). "Substantial evidence" is "evidence which a reasonable mind would accept as adequate to support a conclusion." *Binion,* 108 F.3d at 782. If the ALJ identifies supporting evidence in the record and builds a "logical bridge" from that evidence to the conclusion, the ALJ's findings are supported by substantial evidence. *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

However, if the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

**VI.**     **Framework of Decision**

"Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A physical or mental impairment is one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C § 423(d)(3).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity, (2) whether the claimant suffers from a severe impairment, (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments, (4) whether the claimant is capable of performing work which the claimant performed in the past, and (5) whether any other work exists in significant numbers in the national economy which accommodates the claimant's residual functional capacity ("RFC") and vocational factors. *See* 20 C.F.R. § 404.1520.

**VII.**     **Analysis**

The parties do not contest Steps One through Three and the court finds the ALJ's decisions at these steps to be supported by substantial evidence in the record. The court also concludes that Step Four is not at issue. The ALJ found that Claimant was capable of sedentary

8

work only. The parties do not dispute the sedentary limitation, and the court finds there to be adequate support in the record for such a finding. As the record is clear that none of Claimant's past relevant work was at the sedentary level, the ALJ's Step 4 finding is affirmed.

After viewing the entire record, the ALJ concluded that Claimant had the RFC to perform the full range of sedentary work. (Tr. 48.) Using the Medical-Vocational Guidelines (the "Grids"), the ALJ found that Claimant's age, education, previous work experience, and RFC directed a finding of not disabled under Rule 201.28 and Rule 201.21. (Tr. 48.) The question is whether the ALJ should have included non-exertional limitations into the RFC. If the ALJ was correct to not include non-exertional limitations into the RFC, then the court should affirm the ALJ's decision. If the ALJ erred in not including non-exertional limitations into the RFC, then the court must remand the ALJ's decision because the Medical-Vocational guidelines would no longer be controlling.

At Step Five, the Commissioner must establish that the claimant's RFC allows the claimant to engage in work found in significant numbers in the national economy. *See* 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon the VE's testimony, or by showing that the claimant's RFC, age, education, and work experience coincide exactly with a rule in the Grids. *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987); Social Security Law and Practice, Volume 3, § 43:1. If the Commissioner establishes that sufficient work exists in the national economy that the claimant is qualified and able to perform, then the claimant will be found "not disabled." If no such work exists, the claimant will be found to be disabled.

The ALJ concluded that the Claimant has the RFC to perform the full range of sedentary work. (Tr. 48.) Claimant argues that the ALJ's RFC was not based on substantial evidence

because it failed to account for Claimant's non-exertional limitations. (Pl.'s Br, in Supp. of Summ. J., Dkt. No. 16, pp. 6-7.) Non-exertional limitations are "certain mental, sensory, or skin impairments" which is in contrast to strength limitations. (20 C.F.R. 404, Subpt. P, App. 2, Section 200.00(e)). In order to prove the existence of non-exertional limitations, Claimant relies heavily on the ME's testimony when he opines that Claimant's mental function presents a significant problem in staying on task and limits her to one and two-step tasks. (Tr. 87.) Claimant also proposes that the ALJ was aware of the non-exertional impairments when he noted that the key question was whether she could "stay on task in a competitive work situation . . . ." (Tr. 90.) In the ALJ's decision, he points to several doctors, psychologists, and psychiatrists who did not diagnose Claimant with a brain disorder. (Tr. 47.) While it is true that during Dr. Smick's evaluation in December 2001 Claimant showed deficits in intellectual functioning, Dr. Smick was unable to "produce an accurate assessment against [a] background of inconsistencies." (Tr. 337.) Additionally, when her mental functioning was examined several years later in 2009 by Dr. Hoffman and Dr. Ellen Rozenfeld, Claimant appeared cognitively intact and was not diagnosed with a medically determinable impairment. (Tr. 348-349.) The fact that she was never diagnosed with any impairment is important because Social Security Ruling SSR 96-7p states that:

> [n]o symptom or combination of symptoms can be the basis for finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms.

SSR 96-7p, 1996 WL 374186, at *1. In addition, the following information from the medical record--much of which was pointed out by the ALJ--supports the ALJ's findings,

- In February 2001, Claimant inconsistently indicated that while she blacked out during the car accident, she 'has no memory or thinking problems' and was cognitively intact upon examination at said time. (Tr. 50, 311.)

- In June 2001, Dr. Roth explained that the Claimant's alleged memory symptoms "could conceivably be related to a post-concussion syndrome" and could still improve over time.  (Tr. 334.)

- Claimant had not received medical treatment one would expect of a disabled person. (Tr. 51.)

- Claimant's treatment overall since the alleged onset date has been routine or conservative in nature and Claimant has not received regular treatment from a neurologist. (Tr. 51.)

- Since the alleged onset date, the medical record "fails to reflect any further evidence of significant treatment or diagnosis of an organic brain disorder." (Tr. 47.)

- After a seven year gap in treatment for her alleged mental condition, Claimant saw Dr. Hoffman who found Claimant to have intact memory and cognitive ability, and no additional psychiatric diagnosis beyond a pain disorder related to her physical symptoms.  (Tr. 348.)

- Daily activities such as dressing and bathing herself, making meals, looking after children, doing crossword puzzles, doing household chores, managing her finances, and going to church daily are not limited to the extent one would expect of a disabled individual. (Tr. 52.)

After viewing the medical record in its entirety, the ALJ's decision to assign no non-exertional limitations to Claimant's RFC is supported by substantial evidence in the record.

Additionally, the ALJ never affirmatively stated whether he thought Claimant could not stay on task due to her mental functioning. In fact, the ALJ said during the testimony that although the ME claimed she could not stay on task, that point was "still something to be cited." (Tr. 90.) The ALJ also stated that he was not sure "whether or not she could stay on task." (Tr. 90.) The ALJ's statements during the hearing indicate that he was considering Claimant's mental functioning with regard to the RFC. The ALJ gave Claimant's attorney the opportunity to submit additional evidence regarding her mental capabilities during the hearing, and the Claimant's attorney did submit additional medical evidence from Dr. Ashaye. In a November 2, 2009 physical RFC questionnaire, Dr. Ashaye concluded that Claimant was incapable of even low stress jobs. (Tr. 414.) The ALJ took Dr. Ashaye's findings into consideration but ultimately rejected them as the ALJ found those conclusions "excessive in light of the objective evidence." (Tr. 53.) Also, the ALJ pointed out that Dr. Ashaye had "seen the [C]laimant on only 3 occasions, thereby lacking the longitudinal familiarity with the [C]laimant's condition to make his opinion more persuasive." (Tr. 53.) In short, the ALJ gave Claimant's attorney an opportunity to submit evidence to support a finding of non-exertional limitations, but, after reasonably evaluating the submitted evidence, the ALJ concluded that the evidence did not indicate the presence of non-exertional limitations.

The ALJ appears to have carefully considered the medical evidence in arriving at his decision that Claimant is capable of the full range of sedentary work without non-exertional limitations. The court finds the ALJ's conclusion is supported by substantial evidence in the

medical record. As such, the ALJ was correct that the Grids dictate a finding of 'not disabled.'

Therefore, this court affirms the ALJ's Step Five ruling.

**VIII.**   **Conclusion**

Based the foregoing reasons, the Commissioner's motion for summary judgment is

affirmed and Claimant's motion for summary judgment is denied.

**ENTER:**

_____

**P. Michael Mahoney, Magistrate Judge**
**United States District Court**

**DATE:**____9/10/2012_____